*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* P. GARNER, Minor.

UNPUBLISHED
April 09, 2025
11:55 AM

No. 372324
Muskegon Circuit Court
Family Division
LC No. 22-004802-NA

Before: MURRAY, P.J., and M. J. KELLY and N. P. HOOD, JJ.

PER CURIAM.

Respondent appeals by right the trial court's order terminating her parental rights to her minor child, PG, under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (c)(*ii*) (failure to rectify other conditions), (g) (failure to provide proper care or custody), and (j) (reasonable likelihood of harm if returned to parent). On appeal, respondent argues that the trial court erroneously declined to remove PG from his nonrelative foster care placement and return him to his former relative foster care placement where his sibling resided. Respondent further argues that the trial court clearly erred by finding that termination was in PG's best interests under MCL 712A.19b(5). We disagree and affirm.

## I. BACKGROUND

In October 2022, the Department of Health and Human Services (DHHS) petitioned the trial court to exercise jurisdiction over PG under MCL 712A.2(b)(1) and (2). DHHS alleged that respondent was addicted to methamphetamine, lacked suitable housing, and lacked a stable source of income. It alleged that respondent had been the subject of past Child Protective Services investigations that revealed evidence of drug use, child neglect, and domestic violence exposure. DHHS further alleged that the trial court placed PG's older sister, SB, in a guardianship with the children's maternal grandparents in 2018. It requested that the trial court authorize the petition and adopt a case service plan but did not seek an order removing PG from respondent's home.

After a preliminary hearing, the trial court authorized the petition and allowed PG to remain in respondent's home on the condition that she comply with DHHS's safety plan. Later that month, respondent entered a plea admitting to the allegations in the petition, and the trial court exercised jurisdiction over PG under MCL 712A.2(b)(1) and (2). The trial court adopted a case service plan

that required respondent to refrain from drug use, complete random drug screens, secure and maintain suitable housing and employment, take PG to all of his medical appointments, and engage in treatment for substance abuse, mental health, and domestic violence. Respondent failed to comply.

In January 2023, DHHS filed an emergency petition to remove PG from respondent's home. It alleged that respondent tested positive for methamphetamine, neglected to take PG to pediatric and optometry appointments, allowed PG's medication[1] to lapse, and failed to regularly engage in treatment services. After a hearing, the trial court authorized DHHS to remove PG from respondent's home. DHHS placed PG in relative foster care with his maternal grandparents, where his older sister, SB, already resided under the grandparents' guardianship.

In March 2024, DHHS petitioned the trial court to terminate respondent's parental rights under MCL 712A.19b(3)(c)(i), (c)(ii), (g), and (j). It alleged, broadly, that respondent failed to substantially comply with her case service plan or benefit from the offered services. Respondent consistently tested positive for amphetamine and methamphetamine and failed to maintain suitable housing and employment. DHHS also cancelled a visit with PG in February 2024 because of respondent's "erratic behavior" and refusal to complete a drug screen. DHHS alleged that PG's maternal grandparents "expressed an interest in providing permanency through adoption[]" and that termination would provide both permanency and stability.

In April 2024, DHHS removed PG from his relative foster care placement and placed him in a nonrelative foster care placement. This followed a request from PG's grandparents to remove PG from their care. In early May 2024, respondent moved to review and modify PG's foster care placement under MCR 3.966(A)(1). She stated that PG's maternal grandparents at one point felt that they could not provide long-term care for PG and requested that he be moved to another foster care placement but "deeply regretted their decision" and wanted DHHS to return PG to their care. She also stated that PG's maternal grandparents previously believed that PG's alternative foster care placement "would be temporary and hoped it would force [respondent] to finally get her act together." She argued that returning PG to his maternal grandparents' home was in his best interests because he did well in their care, he shared a strong bond with them, and they were willing to care for him on a permanent basis.[2]

In late May 2024, the trial court held a hearing regarding respondent's motion to review and modify PG's foster care placement. During the hearing, respondent's counsel reiterated many of the points raised in her written brief and noted that PG's older sister, SB, still resided with their maternal grandparents. DHHS opposed respondent's motion on the basis that returning PG to his maternal grandparents was contrary to his best interests. DHHS's counsel stated that the assigned caseworker reported that PG improved in school, appeared happier, and appeared more rested since moving to his new foster care placement. PG's lawyer-guardian ad litem (LGAL) opposed respondent's motion as well. He opined that PG was doing "extremely well[]" in his new foster

---

[1] During a later hearing, an assigned caseworker testified that PG was prescribed medication for attention-deficit/hyperactivity disorder (ADHD).

[2] DHHS did not file a written response to respondent's motion.

care placement. He stated that PG's maternal grandparents had "a great household[]" and "provided amazing care" but described PG's removal from their home as "fairly traumatic." He reported that PG, who was eight years old at the time, expressed that he wished to remain in his new foster care placement and continue to visit respondent and his maternal grandparents. PG's court-appointed special advocate (CASA) volunteer also spoke to PG's foster parents, the Lamkins, who were willing to care for PG on a permanent basis. She expressed concern about returning PG to his maternal grandparents' home based on reports they gave him "adult doses of melatonin at night" that "put him in a trance-like state" and that SB "physically assaulted him at a parenting time."

The trial court denied respondent's motion.[3] It explained its reasoning as follows:

So this is a tough decision. I guess what I have to think about most is what is best for the child and what has the child been through, and I take into account what [the LGAL] has been able to glean from her meeting with the child for one thing, because it's important to know what he wants, and he's been through a lot. It's not all about what we want as adults, but partially about what he's comfortable with and what he thinks is good for him too. And it sounds like he's happy in the Lamkins' home.

So at this point, I think I'm not willing to change placement today, but I would ask for a Family Team Meeting to occur to discuss whether guardianship is a better option versus adoption, and at the next review hearing let's talk about what that looks like because I do think it's important for [PG's maternal grandparents] to still be involved as grandparents, I mean, they're the grandparents and he has a bond with them. And I don't want him to lose them in their lives, but I do think that with the—the reports that you constantly did not want to provide permanency, probably because you want to be grandparents and not have to raise another child. You've raised your child. I can understand that; don't feel bad about that. If that's how you felt and how you feel that's not a bad way to feel, they still want to just be grandparents.

In June 2024, the trial court held a permanency planning hearing. Based on the recommendations of PG's LGAL and CASA volunteer, it declined to change the permanency plan from adoption to guardianship.

In August 2024, the trial court held a hearing regarding DHHS's termination petition. DHHS presented evidence that respondent continued to test positive for methamphetamine and amphetamine, lacked suitable housing and employment, and lacked emotional stability. When the hearing took place, over 550 days had elapsed since the initial petition. During that period, respondent tested positive for methamphetamine or amphetamine in 42 out of the 51 drug screens

---

[3] The parties did not present evidence during the hearing, and the trial court reached its conclusion based on representations made by counsel. Whether these circumstances constitute grounds for reversal is an issue not presently before us.

she completed. She also failed to complete 61 drug screens. According to the assigned caseworker, respondent failed to substantially comply with her case service plan or rectify the primary barriers to reunification.

PG's maternal grandparents both testified during hearing regarding DHHS's termination petition. They acknowledged that they told the assigned caseworker that they were not willing to care for PG on a long-term basis. But they also said they did not actually want PG removed from their home, and they were now willing to adopt PG. PG's maternal grandfather explained their reasoning during the following exchange with respondent's counsel:

> *A.* So, my wife and I had talked and says maybe it'd be advantageous to us to let [the assigned caseworker] know we're not going to keep him forever, and let this get back to [respondent]. And somehow or another, that got totally blown out of proportion. It wasn't our intentions to give the little guy up; that's our grandson.
>
> *Q.* So, what you said is we don't want to keep him forever; is that more in the line with the statement?
>
> *A.* Yes.
>
> *Q.* And is it fair to say you were frustrated with [respondent] at that point?
>
> *A.* Exactly.
>
> *Q.* Did you feel like [respondent] was not stepping up?
>
> *A.* That's the reason why we did it.

The assigned caseworker testified about PG's nonrelative foster care placement. She stated that PG called the Lamkins "mom and dad" and told her that he "never had a bond like that before." PG also told the assigned caseworker that he wanted to remain with the Lamkins. The assigned caseworker stated that PG was doing well in the Lamkins' care, who met PG's needs and provided love and affection. When she asked PG about his grandparents, he responded, "I know they love me, but I don't want to live with them."

After testimony concluded and the parties presented closing arguments, the trial court held that there were grounds to terminate respondent's parental rights under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j), and termination was in PG's best interests given his age, wishes, need for permanency, and overall well-being in his foster care placement. This appeal followed.

-4-

## II. FOSTER CARE PLACEMENT

Respondent argues that the trial court erroneously declined to remove PG from his nonrelative foster care placement and return him to his former relative foster care placement where his sibling resided. We disagree.[4]

"On motion of a party, the court must review the placement order or the initial service plan, and may modify the order and plan if it is in the best interest of the child." MCR 3.966(A)(1). See also MCL 712A.13a(17). We review for clear error the trial court's determination regarding a child's best interests. See *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). A trial court clearly errs if the reviewing court "is left with the definite and firm conviction that a mistake has been made." *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010) (quotation marks and citation omitted). When considering a child's best interests in related contexts, the trial court should weigh all available evidence. See *In re White*, 303 Mich App at 713. It may consider a variety of factors, including the child's well-being while in care, the child's age, the possibility of adoption, and the child's need for permanency, stability, and finality. See *In re MJC*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 365616); slip op at 10. "The focus of the best-interests inquiry is on the child, not the parent." *Id*. at ___; slip op at 9.

During the hearing regarding respondent's motion to review and modify PG's foster care placement, counsel for DHHS cited the assigned caseworker's report that PG improved in school, appeared happier, and appeared more rested since moving to the Lamkins' home. PG's LGAL opined that PG was doing extremely well in the Lamkins' care. He described PG's removal from his grandparents' home as fairly traumatic and stated that PG, who was eight years old at the time, expressed that he wished to remain in the Lamkins' care. PG's CASA volunteer also stated that the Lamkins were willing to care for PG on a permanent basis. She expressed concern about returning PG to his maternal grandparents' home based on reports that they gave him adult doses of melatonin and that SB physically harmed him on one occasion. Because PG thrived with the Lamkins, who were able to provide permanency, stability, and finality, the trial court did not clearly err by declining to remove PG from the Lamkins' home and return him to his maternal grandparents' home.

Respondent suggests that the trial court should have given preference to PG's maternal grandparents, and such preference should have led the trial court to return PG to their home. We disagree. MCL 722.954a provides, in relevant part:

---

[4] At the threshold, DHHS contends that this issue is not properly before us because the order denying respondent's motion to review and modify PG's foster care placement is not appealable by right under MCR 3.993(A). DHHS is correct that the order denying respondent's motion to review and modify PG's foster care placement was not appealable by right under MCR 3.993(A). However, respondent appeals the trial court's order terminating her parental rights to PG, which is appealable by right under MCR 3.993(A)(5). "[A] party claiming an appeal of right from a final order is free to raise issues on appeal related to prior orders." *Green v Ziegelman*, 282 Mich App 292, 301 n 6; 767 NW2d 660 (2009) (quotation marks and citation omitted; alteration in original). Accordingly, this issue is properly before us.

(2) Upon removal, as part of a child's initial case service plan . . . the supervising agency must, within 30 days, identify, locate, notify, and consult with relatives to determine placement with a fit and appropriate relative who would meet the child's developmental, emotional, and physical needs. Preference shall be given to an adult related to the child within the fifth degree by blood, marriage, or adoption provided the relative meets all relevant state child protection standards . . . .

* * *

(5) Before determining placement of a child in its care, a supervising agency must give special consideration and preference to a child's relative or relatives who are willing to care for the child, are fit to do so, and would meet the child's developmental, emotional, and physical needs. The supervising agency's placement decision must be made in the child's best interests. [MCL 722.954a(2) and (5).]

To simplify and shorten: DHHS must consider and prioritize relative placement as part of the initial case service plan, but ultimately the issue is the child's best interests. See *id.* Here, DHHS complied with MCL 722.954a by placing PG with his maternal grandparents as part of his initial case service plan upon removal. DHHS removed PG from his maternal grandparents' home after they expressed that they were not willing to care for him on a permanent basis. By the time respondent moved to review and modify PG's foster care placement, circumstances had changed such that returning PG to his maternal grandparents' home no longer served his best interests. Moreover, our Supreme Court has explained that "the requirements of MCL 722.954a are intended to guide [DHHS's] initial placement decision[]" and apply "*before* any placement decision is made[.]" *In re COH, ERH, JRG, & KBH*, 495 Mich 184, 195; 848 NW2d 107 (2014). We therefore disagree that the trial court should have given preference to PG's maternal grandparents and that such preference should have led it to return PG to their home.

### III. TERMINATION OF PARENTAL RIGHTS

Respondent argues that the trial court clearly erred by finding that termination served PG's best interests under MCL 712A.19b(5).[5] We again disagree.

"Best interests are determined on the basis of the preponderance of the evidence." *In re LaFrance*, 306 Mich App 713, 733; 858 NW2d 143 (2014). We review for clear error the trial court's determination regarding a child's best interests. *In re White*, 303 Mich App at 713. A trial court clearly errs if the reviewing court "is left with the definite and firm conviction that a mistake has been made." *In re Mason*, 486 Mich at 152 (quotation marks and citation omitted).

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012), citing MCL 712A.19b(5). When considering best

---

[5] Respondent does not dispute that there were statutory grounds to terminate her parental rights.

interests, the focus is on the child rather than the parent. *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013). "The trial court should weigh all the evidence available to determine the child's best interests." *In re White*, 303 Mich App at 713. The trial court may consider such factors as "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts*, 297 Mich App at 41-42 (citations omitted). Other factors the trial court may consider include the "parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App at 714.

The trial court's determination that termination was in PG's best interests was not clearly erroneous. The record reflects that PG, who was eight years old on the date of termination, shared a bond with respondent but wished to remain in the Lamkins' care. PG called the Lamkins "mom and dad" and told the assigned caseworker that he "never had a bond like that before." The Lamkins met PG's needs and were willing to care for him on a permanent basis. The assigned caseworker also reported that PG improved in school, appeared happier, and appeared more rested since moving to the Lamkins' home. In contrast, respondent lacked suitable housing and employment. She failed to substantially comply with her case service plan or benefit from the offered services and consistently tested positive for amphetamine and methamphetamine. The trial court therefore did not clearly err by finding that termination served PG's best interests under MCL 712A.19b(5).

Respondent contends that termination was not in PG's best interests because it prevented him from being placed with his relatives. We again disagree. Although a relative placement would have weighed against termination, a trial court "may terminate parental rights in lieu of placement with relatives if it finds that termination is in the child's best interests[.]" *In re Atchley*, 341 Mich App 332, 347; 990 NW2d 685 (2022) (quotation marks and citation omitted). Because PG's maternal grandparents previously wavered in their desire to care for him on a long-term basis, the potential for a relative placement did not undermine the trial court's conclusion regarding PG's best interests.

We affirm.

/s/ Christopher M. Murray
/s/ Michael J. Kelly
/s/ Noah P. Hood

-7-